**Harlan K. SIMONDS, Jr., Plaintiff,**

v.

**GUARANTY BANK & TRUST CO.**

**and**

**James E. Smith, Comptroller of the Currency, Defendants.**

**Civ. No. 74–1105–K.**

United States District Court,
D. Massachusetts.

Oct. 11, 1979.

On Motion to Dismiss April 30, 1980.

Edward H. Comer and Bruce J. Terris, Washington, D. C., Charles D. Bent, Fitchburg, Mass., Patricia G. Curtin, Steve Moulton, Moulton & Looney, Boston, Mass., for plaintiff, Harlan K. Simonds, Jr.

Herrick & Smith, William Shields, III, Boston, Mass., for Guaranty Bank & Trust Co.

Charles K. Mone, Asst. U. S. Atty., Boston, Mass., for U.S.A.

## MEMORANDUM

KEETON, District Judge.

This case is before the court on plaintiff's motion for summary judgment and defendant Comptroller's motion for judgment on the pleadings or, alternatively, for summary judgment. Defendant Bank has filed a memorandum in opposition to plaintiff's motion for summary judgment and in support of defendant Comptroller's motion for summary judgment but has not itself formally moved for summary judgment.

### I. Procedural History

Plaintiff was a shareholder of a bank, The First National Bank of Winchendon, who dissented to the bank's consolidation with defendant Guaranty Bank & Trust Co. Plaintiff's shares in the bank were appraised by defendant Comptroller of the Currency pursuant to 12 U.S.C. § 214a.

In finding a value of $358.79 per share for the 402 shares of First National Bank of Winchendon stock owned by plaintiff, defendant Comptroller, acting through Deputy Comptroller J. T. Watson, approved a recommendation of Assistant Chief National Bank Examiner W. C. Tiede made by a memorandum dated January 30, 1974, as follows:

> It is recommended that the price be based on using the book value plus dividend and deposit premium, market value representing exchange value and investment value based on earnings per share compared to other banks. It is further recommended that equal weight be given to each of the three major considerations.

| | |
|---|---|
| Book value, plus deposit premium of 2.5 per cent and dividend. | 408.70 |
| Market value based on exchange of Guaranty Bank stock. | 455.00 |
| Investment value related to price/earning market values. | <u>212.66</u> |
| Appraised value per share (average of the three factors) | 358.79 |

Record of Appraisal at 008. The memorandum contains no explanation of why it was thought appropriate to give equal weight to the three calculations of value.

The January 30, 1974 memorandum makes no mention of the amount realized by defendant Guaranty Bank on its sale of the Guaranty stock that plaintiff would have received had he approved the consolidation. The author of the memorandum, W. C. Tiede, was advised in a memorandum

of December 11, 1973 from Dorothy Kulig, a staff attorney, that "to consider that price in appraising Mr. Simonds' First National stock would be an unreasonable and invalid method of appraisal . . . [T]he appraisal may not consider the price which Guaranty received in the sale of what would have been Mr. Simonds' Guaranty stock." Record of Appraisal at 309.

## II. Availability and Nature of Judicial Review

■ Defendant Comptroller's motion for judgment on the pleadings is essentially based on the contention that the appraisal of the Comptroller is not subject to judicial review. He argues (1) that the court lacks subject matter jurisdiction because an appraisal under 12 U.S.C. § 214a is not subject to judicial review; and (2) that plaintiff has failed to state a claim upon which relief can be granted because defendant Comptroller has already performed the duty (an appraisal) owing to plaintiff under § 214a. The issue of the availability of judicial review already has been addressed in this case, by another judge of this court, in conjunction with defendant Bank's motion to dismiss. In an Order dated September 5, 1974 the court stated:

It is clear that there is a presumption of reviewability. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 [87 S.Ct. 1507, 18 L.Ed.2d 681] (1967); Davis, *Unreviewable Administrative Action*, 15 F.R.D. 411, 421 (1954). The Administrative Procedure Act, 5 U.S.C. § 701 et seq., reflects the same notion of presumptive reviewability. The presumption may only be rebutted by clear and convincing evidence. *Rusk v. Cort*, 369 U.S. 367, 380 [82 S.Ct. 787, 794, 7 L.Ed.2d 809] (1962); *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir., 1970).

The Court finds nothing approaching "clear and convincing" evidence of an intent to preclude judicial review. The words of the statute—"final and binding" —standing alone are insufficient to satisfy this standard. Nothing in the legislative history supports Guaranty's interpretation. U.S.Code and Congressional Ser-

vice, 81st Cong. 2nd Sess. (1950), p. 3012. On the other hand, there are cases holding that review is appropriate in the face of such words in a statute as "final" and "binding." See, e. g., *Ashe v. McNamara*, 355 F.2d 277 (1st Cir., 1965); *Estep v. United States*, 327 U.S. 114 [66 S.Ct. 423, 90 L.Ed. 567] (1946). See, generally, Davis, *Unreviewable Administrative Action, supra.*

The scope of review is in issue but the fact remains that, in the absence of clear and convincing evidence to the contrary, the challenged action of the Comptroller is reviewable. Accordingly, the motion is denied.

Though proper resolution of the reviewability issue is not beyond dispute, no reason has been found to disturb the earlier ruling of the court. In *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970), the First Circuit Court of Appeals indicated that "in the absence of a clear declaration of Congressional intent" to preclude judicial review of agency action, three factors were determinative of the reviewability question:

first, the appropriateness of the issues raised for review by the courts; second, the need for judicial supervision to safeguard the interests of the plaintiffs; and third, the impact of review on the effectiveness of the agency in carrying out its assigned role.

In the present context, weighing these factors points to the appropriateness of judicial review: *First,* courts have traditionally dealt with valuation questions in the context of appraisal of dissenting shareholders' stock. *See* Note, Valuation of Dissenters' Stock Under Appraisal Statutes, 79 Harv.L. Rev. 1453 (1966). The issues raised are all the more appropriate for review when review is limited in scope, as is the review undertaken by this court in the remainder of this opinion. *Cf. Martignette v. Sagamore Manufacturing Co.*, 340 Mass. 136, 163 N.E.2d 9 (1959) (though Mass.Gen.Laws ch. 156, § 46 provides that findings of appraisers as to value of dissenting shareholder's stock shall be final, findings are subject to judicial review for errors of law). *Second,*

without judicial supervision to safeguard his interests, plaintiff could be deprived of the fair value of his stock because the Comptroller appraised his stock in a manner that was arbitrary or not in accordance with law. *Third*, review of the limited scope here undertaken would not thwart the effectiveness of the Comptroller in making appraisals. Indeed, review of the type here undertaken should assist the Comptroller in making future appraisals by providing, through the judicial opinions explaining the grounds of decision, more guidance than the statute alone provides relative to how such appraisals should be made. For the foregoing reasons, the court reaffirms the previous ruling that judicial review of defendant Comptroller's appraisal of plaintiff's stock is not precluded.

■ The parties agree, and the court concurs, that once it is determined that defendant Comptroller's appraisal of plaintiff's stock is reviewable, the appropriate standard of review is that contained in 5 U.S.C. § 706(2)(A): Was the appraisal "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"? "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

### III. The Method for Determining "Value"

■ The statute under which defendant Comptroller was making the appraisal in this case, 12 U.S.C. § 214a, provides in paragraph (b) that a shareholder of a national banking association who votes against the conversion, merger, or consolidation of the association into or with a State bank is entitled to receive in cash the "value" of his shares, to be determined as of the date of the shareholders' meeting authorizing the conversion, merger, or consolidation. The statute sets forth an appraisal procedure, but it does not define "value" and does not prescribe either a method or the criteria to be applied in determining "value." Also, there are no regulations regarding valuation, nor does there appear to be any reported case law on factors to be taken into account in valuing stock under 12 U.S.C. § 214a or the essentially analogous provisions of 12 U.S.C. §§ 215 and 215a. Likewise, the legislative history offers no guidance. *See* S.Rep.No.1104, 81st Cong., 2d Sess. 2–3, *reprinted in* [1950] U.S.Code Cong.Service, pp. 3012, 3013–3014.

The Comptroller and reviewing courts are nevertheless guided and constrained by a statutory objective which, though not explicitly stated, is manifest in the statute as a whole and from the relationship between the provision for appraisal of "value" and other provisions of the statute. That objective is to provide fair and reasonable compensation for the stock of the dissenting shareholder who objects to the merger and does not wish to exchange stock in a national banking association for stock in a state bank.

What guidelines are to be applied by the Commissioner in determining "value" consistently with this statutory objective of fair and reasonable compensation? In the absence of more explicit guidance in the statute, the answer to this question derives from fundamental characteristics of "fact-finding" in our legal system.

Substantive law criteria for determining rights, including rights to compensation for the value of property, may be expressed in one or the other of two ways that differ sharply in their most common manifestations. One of these ways of defining rights is to do so by particularized rules; the other, by generalized formulations. Variations may be devised with differences less substantial, but it is nevertheless useful to observe the contrast between these two ways as sharply defined.

The method of definition of rights by particularized rules is illustrated by a statutory speed limit and a rule of tort decisional law that anyone exceeding that speed, absent special excuse, is negligent. The method of definition by generalized formulations is illustrated by the judicially created stan-

dard of ordinary care, in the application of which a "factfinder" (jury or judge) considers all the evidence of the circumstances as well as the speed at which a person was driving and determines whether the conduct violated the standard. *Cf.* 2 Pound, Jurisprudence 124–128 (1959). *See also* Keeton, Creative Continuity in the Law of Torts, 75 Harv.L.Rev. 463, 493–495 (1962). Though this determination is often referred to as a finding of fact, it differs essentially from the kind of finding that determines what happened—the finding, for example, of the speed at which the car was proceeding. It requires the "factfinder" to exercise discretion in evaluating what happened as well as finding which among the conflicting versions in the evidence of what happened is correct.

Each of these contrasting methods of determining value is available to lawmakers, and one must look to authoritative sources —constitutions, statutes, precedents, and regulations—to learn which is to be used in a particular context. In some contexts in which value must be fixed to determine legal rights, statutory and decisional authorities have directed the application of a particularized rule declaring that the market price at the appropriate time and place controls. *Cf.* Uniform Commercial Code §§ 2–708, 2–713, 2–723, 2–724 (1962). The "factfinder" determines what that price was—ordinarily a pure finding of fact not involving any exercise of discretion [1]—and by direction of the particularized rule declares that price to be the value. Under such a particularized rule, evidence that the property was actually worth more or less than the market price is legally irrelevant.

The principal reason a lawmaker might choose a particularized rule that the market price is the measure of value seems clear. Whatever the purpose of valuation might be, the price the thing would bring in a genuine market of willing buyers and sellers is likely to be the fairest and most useful measure of value. That measure of value is more likely than any other to produce outcomes consistent with the aim of fair and just evaluation in the highest possible percentage of controversies. In short, if a genuine market exists, it is feasible and appropriate to adopt a particularized rule making the price at the relevant time in that market controlling. In that context, there is no need for resorting instead to a generalized formulation that requires the "factfinder" to consider a variety of factors and to exercise discretion in determining what weight they should receive in the instance at hand.

In other contexts, mandating the application of a particularized rule in all situations is neither feasible nor fair. Also, in relation to a given problem it might be appropriate to direct the application of a particularized rule in some circumstances and a generalized formulation in others. An example of a context in which a particularized rule is applied in certain limited circumstances and a generalized formulation is applied beyond those limited circumstances

---

1. "Market price" and "market value" are, of course, relatively ambiguous terms that can be used in different senses in different contexts. *Cf.* McCormick, Damages 166 (1935). When a regular and active market for an item exists, the meaning of the terms is clear—they refer to the price, or value, of the item in that market. In these contexts a finding of market price or market value is of the "pure" factfinding variety, not involving the exercise of discretion. When a regular and active market for an item does not exist, however, the terms refer to a judgment as to what the price, or value, of the item would be on such a market if it existed. In these contexts a finding of market price or market value is not of the "pure" factfinding variety but rather requires the exercise of some discretion. In practice, then, it may be difficult to determine whether a given method of defining legal rights is, in absolute terms, a particularized rule or a generalized formulation. Nevertheless, viewing particularized rules and generalized formulations as theoretically polar opposites, it is possible to determine whether a given method of defining legal rights tends more toward one extreme or the other. For example, it seems clear that the method of defining rights in the sections of the Uniform Commercial Code cited above, which refer to "market price," is closer to a particularized rule than a generalized formulation, although there may be situations, such as when a regular and active market does not exist, when a generalized formulation will of necessity have to be applied.

is 12 U.S.C. § 215. It prescribes a method for determining a minimum value by establishing a particularized rule that a dissenting shareholder shall receive no less for his stock than the amount for which the stock is sold at auction. A value above that minimum may be allowed, however, as determined by a generalized formulation taking into account other factors and weighing them in a discretionary determination.

In relation to 12 U.S.C. § 214a, however, no particularized rule for determining value has been prescribed, either by the statute, in court decisions, or in regulations. The problem thus presented for the Comptroller is a difficult one, in relation to which he has been required to act with minimal guidance and direction. He is nevertheless subject to constraints incident to the statutory objective. Also, in determining value he must of necessity apply a generalized formulation, as distinguished from a particularized rule, unless he has authority to fashion such a rule, by regulation or otherwise. There is no suggestion that the Comptroller in this instance has fashioned or meant to assert authority to fashion a particularized rule. Instead, it appears that the Comptroller recognized, as does this court, that 12 U.S.C. § 214a confers upon the Comptroller the authority, by appraisal, to find value, but does not prescribe a particularized rule to be applied by the Comptroller and does not authorize the Comptroller to adopt a particularized rule in deciding a particular case at hand.

The statute, conferring on the Comptroller authority and responsibility for determining value and prescribing no method or particularized rule for doing so, necessarily places upon the Comptroller the responsibility for determining value by the exercise of discretion, taking into account relevant factors and determining what weight they deserve in the instance at hand.

The generalized formulation the Comptroller applies in making an appraisal must aim at fulfilling the statutory objective of fair and reasonable compensation. It is appropriate for the Comptroller to consider different elements of value, as he did in this case. The weight to be given to the various elements, however, will vary from case to case, depending on the attendant circumstances. That one calculation of value is substantially out of line with others, for example, may be an indication that its reliability should be doubted, and that it therefore should be given relatively less weight than the others.

The weighting of various elements of value is a matter calling for the exercise of judgment. It is inappropriate and impermissible to apply a rigid formula giving equal weight to three factors, or sets of factors, and three only, in place of exercising this judgment. Cf. Note, Valuation of Dissenters' Stock Under Appraisal Statutes, supra, at 1457, 1468–71. To do so would be to fashion and apply a particularized rule rather than to apply a generalized formulation consistent with the statute.

Here defendant Comptroller gave equal weight to each of the three elements of value he considered without articulating his reason for doing so. See Part I, supra. In the absence of an explanation of the reason for this course of action, see SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943), and in light of the substantial disparity between the third element, "investment value," and the other two, the inference is compelling that the Comptroller was applying a rigid formula rather than exercising his judgment. His action therefore was not in accordance with law, and it must be vacated.

The Kulig memorandum of December 11, 1973 to Tiede stated that the amount realized by defendant Bank on its sale of the Guaranty stock that plaintiff would have received had he approved the consolidation not only was not controlling on the question of the value of plaintiff's stock but could not be considered. See Part I, supra. In light of this advice and the failure of the Tiede memorandum of January 30, 1974 to mention the amount realized on the sale of the Guaranty stock, the inference is compelling that the Comptroller did not consider evidence of the amount so realized because it was thought impermissible to do so. In

view of the court's holding that defendant Comptroller's appraisal must be vacated because defendant Comptroller used an impermissible, rigid formula for determining value, the court need not decide whether this failure to consider the amount realized on the sale of the Guaranty stock, standing alone, would require the appraisal to be vacated.[2] Suffice it to say that the advice contained in the Kulig memorandum of December 11, 1973 states an incorrect rule of law. Although the amount realized on the sale of the Guaranty stock certainly is not controlling on the question of the value of plaintiff's stock on the valuation date, it may be considered by defendant Comptroller as relevant evidence of value.

### IV.

.   .   . [This part of the opinion of October 11, 1979, addressing other arguments advanced by the plaintiff, is deleted.]

### V.

For the reasons set forth above, defendant Comptroller's motion for judgment on the pleadings or, alternatively, for summary judgment will be denied.

Final decision on plaintiff's motion for summary judgment will be deferred pending clarification by the parties of their respective positions relative to the appropriate manner of proceeding in light of this opinion. Plaintiff has sought three alternative remedies:

(1) an order compelling defendant Bank to select a person to represent it on a 12 U.S.C. § 214a appraisal committee;

(2) an order compelling defendant Comptroller to make a new determination of the value of plaintiff's shares;

(3) an order determining the value of plaintiff's shares.

Whether entry of summary judgment for plaintiff is appropriate may depend on which of these remedies is appropriate. The parties may file with the court, on or before November 16, 1979, memoranda indicating their positions on this issue.

### MEMORANDUM

#### On Motion To Dismiss

KEETON, District Judge.

This is yet another chapter—and for reasons stated in this opinion still not the last chapter—in a history of litigation more protracted than in the interests of the parties and in the public interest it should have been.

### I. Procedural History

The first matter before the court is plaintiff's Motion to Dismiss with prejudice and without costs as to all defendants in accordance with the settlement agreement between plaintiff, Harlan K. Simonds, Jr., and defendant Guaranty Bank & Trust Co. The motion is opposed by defendant Comptroller of the Currency.

The second matter before the court is defendant Comptroller's "Motion to Vacate Judgment as Moot," which is opposed by plaintiff.

Plaintiff, a shareholder of The First National Bank of Winchendon, dissented to the Winchendon bank's consolidation with defendant Guaranty Bank & Trust Co. Plaintiff's shares of stock were appraised by defendant Comptroller pursuant to 12 U.S.C. § 214a. Defendant Comptroller approved a recommendation by memorandum of January 30, 1974, finding a value of $358.79 per share for the 402 shares owned by plaintiff. This valuation was the result of a recommendation "that equal weight be given to each of the three major considerations"—book value, market value based on

---

2. Defendant Bank has taken the position in its motion in support of defendant Comptroller's motion for summary judgment and in opposition to plaintiff's motion for summary judgment that failure to consider the amount realized on the sale of the Guaranty stock was at most harmless error. It argues that consideration of that amount could only have led to a

lower appraised value for plaintiff's stock, since it would merely be additional evidence of market value, and the Comptroller used a figure for market value well in excess of the market value as computed in relation to the amount realized on the sale of the Guaranty stock.

exchange of Guaranty Bank stock, and investment value. The memorandum contains no explanation of why it was thought appropriate to give equal weight to the three calculations of value.

In an opinion filed October 11, 1979, this court, reviewing the Comptroller's action to determine whether the appraisal was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), concluded that the Comptroller had applied a rigid formula rather than exercising his judgment in accordance with the responsibility committed to the Comptroller by 12 U.S.C. § 214a, and that his action therefore was not in accordance with law. Supra, at pp. 1082–1084. For that reason, on October 11, 1979, the court denied defendant Comptroller's motion for judgment on the pleadings, or alternatively, for summary judgment. As stated in the opinion of October 11, 1979, however, the court deferred final decision on plaintiff's motion for summary judgment pending clarification by the parties of their positions with respect to whether the court should order the Comptroller to make a new determination of value or instead should proceed in some other way.

Responses of the parties disclosed, among other things, that litigation costs of the two private parties probably had already exceeded the difference between the minimum that defendant Guaranty Bank admittedly owed and the maximum that plaintiff claimed. In light of this disclosure, the court entered an order on December 6, 1979, directing plaintiff and defendant bank to confer with respect to whether they might enter into a Settlement Procedures Agreement and, if not so agreeing, to submit briefs on or before January 28, 1980, on four unresolved issues. 480 F.Supp. 1257. Thereafter plaintiff and defendant bank requested and were allowed an extension of time pending negotiations. On February 15, 1980 they filed a settlement agreement, and plaintiff filed the motion to dismiss that is now before the court, opposed by defendant Comptroller.

II. The Comptroller's Motion to Vacate

The Comptroller "moves the court to vacate its judgment of October 11, 1979, on the grounds that subsequent to the court's judgment, the private parties to the action have settled the suit and have moved to dismiss the action, and in doing so, have rendered this court's decision moot." In support of his motion, the Comptroller relies upon *Great Western Sugar Co. v. Nelson*, 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735 (1979), *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), and *Duke Power Co. v. Greenwood County*, 299 U.S. 259, 57 S.Ct. 202, 81 L.Ed. 178 (1936). As plaintiff's response correctly observes, however, each of these cases ordered vacation of a *judgment*. In contrast, all of the decisions and orders heretofore entered by this court in the present case disclose explicitly that they do not have the characteristics of a judgment.[1] They are, instead, interlocutory in nature.

A final judgment, if allowed to stand, would continue to affect the rights of the parties under principles of *res judicata*. Restatement of Judgments § 79 (1942). *See* Restatement (Second) of Judgments § 68 (Tent.Draft No. 4, 1977) and § 78 (Tent.Draft No. 2, 1975). In contrast, interlocutory determinations would no longer have effect between the parties after entry of a final judgment of dismissal with prejudice entered pursuant to an agreement among all the parties to the action. *See* Restatement of Judgments § 41 (1942).

For the foregoing reasons, had defendant Comptroller joined in the agreement in this case, there would be no need or occasion for

---

1. First, they do not come within the definition of "judgment" in Fed.R.Civ.P. 54 and 58. Second, they do not come within the definition of a final judgment to which the rules of *res judicata* apply. "An order or judgment of a court is not final if an issue of law or fact essential to the disposition of the action is reserved for judicial determination." Restatement of Judgments § 41, comment a (1942). *See* Restatement (Second) of Judgments § 41, comment b (Tent.Draft No. 1, 1973). *See also* 10 Wright and Miller, Federal Practice and Procedure § 2651 (1973).

vacating these interlocutory determinations. Indeed, it may even be doubted that the court could properly do so since, the agreement of the parties having resolved all differences, no case or controversy would remain to sustain the exercise of judicial power. *Cf. Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241, 57 S.Ct. 461, 463–464, 81 L.Ed. 617 (1937). If there were such agreement of all parties, no need would appear for doing more than entering a final order of dismissal in accordance with the agreement.

■ Plaintiff's response to the Comptroller's motion to vacate suggests that the Comptroller's concern is not that the interlocutory determinations may have effect in the future among the parties to this case but instead that they may be relied upon to persuade others to adopt the conclusions reached by this court. Principles of *stare decisis* and not *res judicata* are relevant to that concern. *See* Restatement of Judgments § 70, comment *a* (1942). The parties now before this court, even though treating the matter as sufficiently important to them in principle to present opposing briefs, do not present an existing case or controversy over what attention, if any, the opinion of October 11, 1979, should be given in another case. That question will be ripe for determination, if ever, only in some other case.

The fact that the Comptroller has not joined in the settlement agreement does not negate the conclusion that no case or controversy remains for the court's exercise of judicial power in relation to matters that were the subjects of the interlocutory determinations of October 11, 1979. It takes two, at least, to make a controversy, and two with opposing legally cognizable interests. Not even one party with such an interest in these matters is now before the court. The Comptroller's interest has never been more than that of the public official designated by statute as the appraiser of the 402 shares of stock. When the private parties have agreed upon the value of the stock, the appraiser's function and interest in the appraisal are ended. Indeed, in a memorandum in response to the October 11, 1979 order and opinion of the court, the Comptroller, urging the court to value plaintiff's shares itself rather then to remand the case to the Comptroller for such valuation,[2] asserted the following position:

> Here . . . the Comptroller does not have a continuing interest in the litigation. The Comptroller performed an appraisal only because the interested parties could not agree on an independent committee to do the appraisal. The ultimate decision on the value of the shares of stock has no impact on the public treasury and no impact on the agency.

Defendant Comptroller's Memorandum in Response to October 11, 1979 Order and Opinion, p. 2.

Although no party has raised the question whether defendant Comptroller was either a necessary or a proper party to this action, the anomaly of the Comptroller's present contentions is the more striking in view of the fact that his action was essentially adjudicative in nature. In contrast with the more usual pattern among cases of judicial review of agency action, in which the agency has a clear interest in the outcome because of its potential impact on continuing agency activity, in this case the agency "interest" is more like the nonjusticiable "interest" of a trial court in an appeal from the trial court's judgment. In any event, even if doubts about whether the Comptroller ever had a legally cognizable interest in this case are resolved in his favor, that interest can no longer be a justiciable interest when no party remains to controvert it. Thus, no case or controversy remains, unless there is a controversy over costs—a question addressed in Part III, *infra*.

For these reasons, the Comptroller's motion to vacate the determination of October 11, 1979, because of the settlement between the private parties, does not present a justiciable issue.

---

2. In the opinion of December 6, 1979, the court concluded that, even at the Comptroller's invitation, it could not properly perform this function that is assigned by statute to the Comptroller. 480 F.Supp. at 1259.

### III. Plaintiff's Motion to Dismiss

Plaintiff moves that the court dismiss with prejudice and without costs as to all defendants. Lack of consent of the Comptroller to this motion stands in the way of final disposition; it leaves the issue of costs unresolved. The court cannot enter a final judgment, over the opposition of the Comptroller, without determining whether the Comptroller is entitled to recover his costs. If the Comptroller does not waive his claim for costs, however, it may be argued that the court should deny that claim on the ground that the Comptroller's appraisal was not in accordance with law for reasons fully stated in those parts of the opinion of October 11, 1979, that are published supra. Thus, through the avenue of a controversy over costs, defendant Comptroller may make it appropriate, and perhaps even necessary, for the court to enter a final judgment based in part on grounds stated in the opinion of October 11, 1979.

If defendant Comptroller presses a claim for costs and plaintiff opposes it, a justiciable issue will be presented. The burden on public and private resources that would result from further controversy over such a limited issue [3] should be a matter of grave concern to each party, even though this court must be sensitive to its responsibility of deciding any contest over costs that is not resolved by waiver of a claim or by agreement of the parties.

Defendant Comptroller's opposition to plaintiff's motion to dismiss is silent as to whether the Comptroller wishes to claim costs. Rather than take this silence as a waiver, however, the court will allow the Comptroller 15 days within which to assert a claim for costs. If no claim for costs is filed within that period, the court will direct the entry of final judgment of dismissal with prejudice and without costs as to all parties, in accordance with the settlement agreement between the plaintiff and the defendant Guaranty Bank and Trust Co.[4]

3. Without the benefit of the views of counsel for the parties, the Clerk of the Court estimates that taxable costs the Comptroller might legitimately claim would not exceed $20. *See* 28 U.S.C. § 1923.

4. The Comptroller of the Currency having filed a waiver of costs, the court on May 19, 1980 ordered the action dismissed with prejudice and without assessment of costs in accordance with the settlement agreement.